IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER WHISENANT,

          Petitioner,               No. 2:11-cv-0697-FCD-JFM (HC)

     vs.

G. SWARTHOUT,

          Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

       Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner claims his Fourth Amendment rights were violated when the trial court denied his motion to suppress, and his Eighth Amendment rights were violated when the trial court declined to strike one or both of his prior convictions. Petitioner argues that the sentence imposed constitutes cruel and unusual punishment.

PROCEDURAL BACKGROUND

       Petitioner was convicted by a jury on September 26, 2007 of possession of a firearm (in violation of Cal. Pen. Code § 12021(a)(1)[1]); and possession of ammunition (in violation of § 12316(b)(1)). See Clerk's Transcript ("CT") at 250-51. With an enhancement for

_____

[1] All future statutory references will be to the California Penal Code unless noted otherwise.

1

1    two prior convictions, the trial court sentenced petitioner on February 8, 2008 to two concurrent

2    indeterminate terms of twenty-five years to life with the possibility of parole and a concurrent

3    two-year determinant term.  CT at 71-72.

4            Petitioner appealed to the California Court of Appeal, Third Appellate District.

5    See Lodgment ("LD"), Appellant's Opening Br.[2]  In an unpublished opinion filed on February 9,

6    2010, the appellate court affirmed the judgment and sentence.  Ans., Ex. A.

7            On March 22, 2010, petitioner filed a petition for review in the California

8    Supreme Court.  LD, Pet'r's Pet. for Review, Cal. Supreme Ct.  On April 28, 2010, the

9    California Supreme Court summarily denied the petition.  LD, Order Den. Pet. for Review, Cal.

10   Supreme Ct.

11           Petitioner did not file any petitions for post-conviction relief in the state courts.

12           Petitioner initiated this action on March 14, 2011.  Respondent filed an answer on

13   June 21, 2011.  Petitioner filed a traverse on August 22, 2011.

14                                   FACTUAL BACKGROUND[3]

15           On the night of April 2, 2005, Bush, [petitioner] and Benny Ramos, not a
     party to this appeal, were in a Chevrolet Blazer that was pulled over after a
16   sheriff's deputy heard gunshots, then saw the Blazer coming from the direction of
     the gunshots.  The Blazer contained a ballistic vest, or "body armor," and a load
17   pistol magazine.  Three loaded pistols of different calibers were found by the road
     along the route between where the deputy began following the Blazer and where
18   he stopped it.  Five bullets of unusual caliber were found in the patrol car Bush
     had been in, and they fit one of the guns found by the roadside.  The magazine
19   found in the vehicle fit a different gun found by the road.  All three men had
     felony convictions.

20   /////

21   /////

22

23   _____

24   [2]  Respondent does not identify the lodgments filed July 26, 2011 by number.  Rather,
     they are identified by the title of the document.

25   [3]  The statement of facts is taken from the opinion of the California Court of Appeal for
     the Third Appellate District in People v. Whisenant et al, No. C058320 (February 9, 2010), a
26   copy of which is attached to respondent's answer as Exhibit A.

1           ANALYSIS

2  I.  Standards for a Writ of Habeas Corpus

3           Federal habeas corpus relief is not available for any claim decided on the merits

4  in state court proceedings unless the state court's adjudication of the claim:

5           (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
6           determined by the Supreme Court of the United States; or

7           (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
8           State court proceeding.

9  28 U.S.C. § 2254(d).

10          Under section 2254(d)(1), a state court decision is "contrary to" clearly

11  established United States Supreme Court precedents if it applies a rule that contradicts the

12  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

13  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

14  result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

15  (2000)).

16          Under the  "unreasonable application" clause of section 2254(d)(1), a federal

17  habeas court may grant the writ if the state court identifies the correct governing legal principle

18  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

19  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

20  simply because that court concludes in its independent judgment that the relevant state-court

21  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

22  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

23  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

24  question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks

25  to the last reasoned state court decision as the basis for the state court judgment.  Avila v.

26  Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II.  Petitioner's Claims

      1.     Ground One

        In ground one, petitioner claims that the trial court violated his Fourth Amendment rights by improperly denying his motion to suppress.

        The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal:

B. Facts from Suppression Hearing

        Sacramento County Deputy Sheriff Jason Harris was the only witness at the hearing [on the motion to suppress].  He had been a patrol deputy for over six years.  On April 2, 2005, at about 11:20 p.m., he was parked near Kiefer Boulevard and Happy Lane, by Mather Air Force Base, doing paperwork.  It was a remote, industrial area, "mostly just an open area," although there were a few residences.  No businesses were open and he saw no vehicles in the 10 minutes he was there.

        Deputy Harris then heard at least two gunshots from the south, "very close.  Within a couple of hundred yards at the most."  He had been in the U.S. Army for six years, and through that experience and his duties as a deputy, he was very familiar with the sound of gunshots and was certain he heard gunshots.  A Chevrolet Blazer with tinted rear windows then passed him, coming from the south, about 10-15 seconds after the gun shots, "And from the sound of it, it was accelerating" but it had not yet reached the speed limit.  Deputy Harris could see at least two people inside, who looked at him as the Blazer passed by.  Because that was the only vehicle he had seen in the remote area since he had been there, he followed it.  He paced it going 60 miles per hour in a 45 mile-per-hour zone.  He pulled the Blazer over close to a "fairly secluded" area.  He stopped the Blazer because of the speeding and to investigate the gunshots.

        Deputy Harris saw there were three people in the car and he "request[ed] identification from all three[,]" which they gave.  When he checked and learned all three men had violent felony convictions, including for murder, assault with a deadly weapon and "Things like that[,]" he called for backup.  Backup arrived within five minutes.  Out of concern about weapons in the car, the officers drew their guns, called the occupants out one by one, patted each down and placed them in separate patrol vehicles.  [Petitioner] and Bush had been passengers; Ramos had been driving.

        Deputy Harris testified that when the men were extracted, he saw a ballistic vest on the back seat.

        Because the occupants were felons, Deputy Harris correctly believed it was illegal for any of them to possess a ballistic vest.  (See Pen. Code, § 12370, subd. (a).) [Footnote omitted.]  Therefore, he believed he had probable cause to arrest them and impound the Blazer.  He saw an open alcohol container, and then

4

looked in the glove box, where he found a loaded pistol magazine.  His subjective reason to search was because he did not want to leave a firearm in the Blazer.

Deputy Harris testified the entire encounter between stopping the Blazer and searching the vehicle was 8-10 minutes.  It usually takes him less than 10 minutes to stop a vehicle and write a traffic citation.

The trial court denied the motion.

C. Analysis

The claims on appeal can be grouped into four categories:  First, defendants were improperly detained because only a "hunch" connected the Blazer to gunshots.  Second, it was improper for Deputy Harris to obtain their identification.  Third, their detention was excessive, and was transformed into an arrest without probable cause.  Fourth, the search of the Blazer was unlawful.

We disagree with each of these claims.

1. Detention of Passengers

Defendants contend that as passengers in a car pulled over for a speeding violation, their detention was unreasonable.  They assert Deputy Harris had only a "hunch" to connect them to the gunshots.  We disagree. FN 3.

FN 3.  Defendants contend all of the tangible evidence against them should have been suppressed.  But the guns (and the ammunition inside them, which the prosecutor argued could support the ammunition charge) were found abandoned by the road and were not suppressible.  (See *People v. Tuck* (1977) 75 Cal.App.3d 639, 646; *U.S. v. McLaughlin* (9th Cir. 1975) 525 F.2d 517, 519-520.)

"A suspect may be detained if an officer has a reasonable suspicion that criminal activity is afoot and that the suspect is connected with it.  [Citation.]  The officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant"' his action.  [Citation.]  This is a totality of the circumstances evaluation, in light of the officer's training and experience."  (*People v. Osborne* (2009) 175 Cal.App.4th 1052, 1058 (*Osborne*).)  "Law enforcement officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."  [Citations.]'"  (*People v. Hernandez* (2008) 45 Cal.4th 295, 299.)  But "officers are not entitled to rely on mere hunches."  (*Ibid*.)

Deputy Harris had more than a hunch about the Blazer's connection to the gunshots, he had a reasonable suspicion.  He had been parked in a remote area late at night for 10 minutes and had not seen any cars.  Within 10-15 seconds of the moment he heard two gunshots nearby, the Blazer came from the direction of those gunshots, accelerating.  Given the totality of the circumstances, we agree with the trial court's observation that Deputy Harris "would be derelict in his duty if he did not pursue the vehicle at least to investigate whether or not that vehicle had some connection to those gunshots."

5

In addition to arguing there was insufficient cause to believe the Blazer had a connection to the gunshots, Bush contends those shots might have been "legal hunting, target practice, or an accidental discharge of a weapon.  Possibly it was not even a gunshot but a car backfiring."  The fact there may ultimately have been an innocent explanation for what Deputy Harris heard does not mean he lacked reasonable grounds for suspecting criminality.  (See *People v. Foranyic* (1998) 64 Cal.App.4th 186, 189-190.)  Further, Deputy Harris testified what he heard was not a car backfiring, and he had ample experience to know he heard gunshots.  The fact there were two shots makes the theory of accidental discharge implausible, and the fact it was *nighttime* makes the theories of innocent hunting or target shooting implausible.

Because Deputy Harris reasonably believed the Blazer and its occupants were connected to the gunshots, it was proper for him to detain them to investigate those gunshots.

2. Identification of Passengers

Defendants contend Deputy Harris could not "require" or "demand" that they identify themselves.

But, as the Attorney General notes, Deputy Harris asked for identification, he did not demand it.

"In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.  '[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure.'"  (*Hiibel v. Sixth Judicial Dist. Ct.* (2004) 542 U.S. 177, 185 [159 L.Ed.2d 292, 302].)  "Obtaining a suspect's name in the course of a Terry stop serves important government interests.  Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder.  On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere."  (*Id.* at p. 186 [159 L.Ed.2d at p. 303].)  It is "well established that an officer may ask a suspect to identify himself in the course of a Terry stop[.]"  (*Id.* at p. 186 [159 L.Ed.2d at p. 303]; see *People v. Vibanco* (2007) 151 Cal.App.4th 1, 13-14 (*Vibanco*).)

Accordingly, Deputy Harris properly asked defendants for their identification.

Bush argues that because a passenger is necessarily detained when a vehicle is stopped (*Brendlin v. California* (2007) 551 U.S. 249 [168 L.Ed.2d 132]), "an officer needs a specific reason for requiring identification and cannot seek identification simply because of vague investigatory reasons to satisfy a hunch."  He relies heavily on *People v. Spicer* (1984) 157 Cal.App.3d 213.  In that case a car was stopped and, as the driver was given a field sobriety test by one officer, another officer approached the passenger.  This officer asked the passenger for identification, although it was stipulated that he "had no reasonable basis for suspecting her of any crime."  (*Id.* at p. 216.)  In such circumstances, the court held the passenger had been detained.  In reaching that conclusion the court

relied in part on the fact that the officer had not told the passenger why he asked her for her identification, and observed that a citizen could rationally interpret a request for identification by a peace officer to be a demand.  (*Id.* at pp. 219-220.) But as stated, in *Spicer*, the parties stipulated there was no reason to think the passenger had done anything suspicious.  (*Id.* at p. 216.)  Here, in contrast, Deputy Harris reasonably connected the Blazer occupants with a suspicious shooting.  The detention of the passengers was not based on the speeding offense committed by the driver, Ramos.

Bush also argues "less invasive avenues of inquiry, other than demanding identification cards" could have been employed, and vaguely states Deputy Harris "could have reasonably sought information about the gunshots he claimed to hear without first requiring that the passengers provide identification.  Only as a follow up to such initial inquiry should the deputy be entitled to ask for identification[.]"  This is unrealistic.  We doubt that if Deputy Harris had asked if the men had been shooting that he would have received an answer that would have dispelled his concerns.  Asking for identification to find out who the men were was a prudent early step to take. FN 4.

FN 4.  [Petitioner] cites *People v. Loudermilk* (1987) 195 Cal.App.3d 996, for the proposition that an officer may not ask passengers for identification. *Loudermilk* did not involve a traffic stop, but held an officer may ask for identification from a person lawfully detained.  (*Id.* at pp. 1000-1003.)  It also held that the failure of a person to identify himself "may by itself be considered suspect and together with surrounding events may create probable cause to arrest."  (*Id.* at p. 1002.)

Because we hold that defendants were lawfully detained, it was proper to ask them for identification.

3. Excessive Detention

Defendants contend it was improper to handcuff them and place them in patrol cars during a traffic stop, effectively arresting them without probable cause.

Again, defendants were not merely passengers in a vehicle stopped for a traffic offense, they were occupants of a vehicle reasonably suspected of involvement in a shooting, and were detained to allow that matter to be investigated.  "To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."  (*Arizona v. Johnson* (2009) 555 U.S. 249, ——— [172 L.Ed.2d 694, 700]; see *Osborne*, supra, 175 Cal.App.4th at p. 1059.) "[T]he handcuffing of a detained individual does not necessarily convert the detention into a de facto arrest. [Citation.] . . .  [A] police officer may handcuff a detainee without converting the detention into an arrest if the handcuffing is brief and reasonably necessary under the circumstances."  (*Osborne*, supra, 175 Cal.App.4th at p. 1062.)

At the time the men were removed from the Blazer and handcuffed, they reasonably seemed to be connected to the gunshots.  It was nighttime in a remote

area of Sacramento County.  The officers knew all three men had been convicted of violent felonies.  In such circumstances, removing the men from the Blazer to handcuff them as part of the investigative detention was a prudent method of continuing the investigation while protecting the safety of the officers.  (See *People v. Stier* (2008) 168 Cal.App.4th 21, 27-28; *Vibanco*, supra, 151 Cal.App.4th at pp. 11-12.)

Before the Blazer search began, the men were detained for about the same time it would have taken to process a traffic citation, therefore the length of the detention was not excessive.  Nor was there dilatory conduct; the record shows "the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances."  (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 384-385, quoted with approval by *People v. Celis* (2004) 33 Cal.4th 667, 674-675.)  This was not an improper "unnecessary extension of the traffic detention to investigate extraneous matters" (*Williams v. Superior Court* (1985) 168 Cal.App.3d 349, 359) as [petitioner] claims.

Accordingly, the detention was not excessive in manner or duration.  As discussed in the next section, probable cause to arrest was discovered when the men were removed from the Blazer.

4.  Search of the Blazer

In their opening briefs, defendants contended the Blazer search was not a valid search incident to a lawful arrest and was not supported by probable cause.  After the opening briefs were filed, the United States Supreme Court decided *Arizona v. Gant* (2009) 556 U.S. ——— [173 L.Ed.2d 485] (*Gant*), holding:  "Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest."  (*Id.* at p. ——— [173 L.Ed.2d at p. 501].)  In their reply briefs, defendants argue the Blazer search was unlawful because all three occupants were already handcuffed and in patrol cars.

Although defendants are correct that the Blazer search could not be justified by the first part of the *Gant* holding, the search was justified by the second part, because the officers had probable cause to arrest all three defendants when they saw the ballistic vest in plain sight, giving them reason to believe the Blazer had other evidence of the arrest offense. Defendants assert the ballistic vest, critical to probable cause, was found during the Blazer search.  But viewing the evidence in the light favorable to the trial court's ruling (*Munoz*, supra, 167 Cal.App.4th at pp. 132-133), Deputy Harris saw the vest in plain sight when the men were taken out of the Blazer.  His relevant testimony is as follows:

1) "Q.  After the defendants are removed from the vehicle, what do you do next'

"A.  We search the vehicle.

/////

8

"Q. When you first look into the vehicle, do you see anything at the point that you first look inside' . . .

"A. There was a ballistic vest in plain view on the back seat of the vehicle.

"Q. Now with — given your understanding of the defendants' criminal histories, is that a crime'

"A. Yes.

"Q. Are each of the defendants arrestable in your mind at that point'

"A. Yes.

"Q. Can the car be impounded in your mind at that point'

"A. Yes.

"Q. What else do you see as you just look in the car'

"A. An open container of alcohol."

2) "Q. So it is only when you order them out of the car, right - -

"A. Right.

"Q. -- that you are able to see what you identify as a bullet-proof vest which . . . you at that point know is contraband; is that right'

"A. Right."

3) "Q. Now at that point when backup arrives, how do you decide that you are going to get into that car to make the search'

"A. I believed it was necessary for my safety and for the safety of my fellow officers to ensure that there were no firearms in the vehicle.

"Q. And what do you do then'

"A. We look in the vehicle and find that there is a ballistic vest on the back seat."

Although these passages contain some ambiguity, taking them together, the trial court could rationally find that as the men were taken out of the Blazer, the vest was in plain sight, that is, seen before the officers entered the Blazer to search it.  In fact, this is how the parties interpreted the evidence in the trial court. Defense counsel focused on the claim it was illegal to take the men out of the Blazer, contending Deputy Harris could not see the vest until they were taken out

9

of the Blazer; the prosecutor argued the men could be arrested once the vest was seen.  These arguments comport with our conclusion that the testimony, albeit not crystalline, supports the fact that the vest was in plain sight before the search of the Blazer began.

Because it is unlawful for convicted felons to possess such a vest (see Pen. Code, § 12370, subd. (a)), once Deputy Harris saw the vest he had probable cause to arrest all three men.  At that point, Deputy Harris merely needed a "reasonable basis to believe" that the Blazer contained evidence pertaining to the offense of arrest.  (*Gant*, supra, 556 U.S. at p. ———— [173 L.Ed.2d at p. 496]; *Osborne*, supra, 175 Cal.App.4th at pp. 1063-1065.) Having heard gunshots he linked to the Blazer, having identified the occupants as violent felons, and having seen a ballistic vest in the Blazer, Deputy Harris had a reasonable basis to seize the vest and search the Blazer for other evidence of the offense.  Accordingly, the Blazer search was lawful.

For all of the above reasons, we conclude the trial court properly denied the motion to suppress evidence.

People v. Whisenant et al., slip op. at 3-15.

Under Stone v. Powell, 428 U.S. 465 (1976), petitioner's claim that his motion to suppress was improperly denied in violation of the Fourth Amendment is barred.  In Stone, the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Id. at 482.  The Supreme Court instructed that state prisoners were not entitled to federal habeas relief on Fourth Amendment grounds if they were able to litigate fully their Fourth Amendment claims in state court.  Id.  Thus, a Fourth Amendment claim can only be litigated on federal habeas where petitioner demonstrates that the state did not provide an opportunity for full and fair litigation of the claim; it is immaterial whether the petitioner actually litigated the Fourth Amendment claim, whether the state courts correctly disposed of the Fourth Amendment issues tendered to them, or even whether the claim was correctly understood.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); Siripongs v. Calderon, 35 F.3d 1308, 1321 (9th Cir. 1994); Gordan v. Duran, 895 F.2d 610, 613 (9th Cir. 1990).

1    The record shows that petitioner was provided with the opportunity to litigate

2 fully his Fourth Amendment claims.  A defendant may move to suppress illegally obtained

3 evidence in the trial court pursuant to California Penal Code § 1538.5(a) which provides:

4          (1) A defendant may move . . . to suppress as evidence any tangible or intangible
           thing obtained as a result of a search or seizure on either of the following
5          grounds:

6          (A) The search or seizure without a warrant was unreasonable.

7          (B) The search or seizure with a warrant was unreasonable because
           any of the following apply:
8
                (I) The warrant is insufficient on its face.
9
                (ii) The property or evidence obtained is not that described in the
10              warrant.

11              (iii) There was not probable cause for the issuance of the
                warrant.
12
                (iv) The method of execution of the warrant violated federal or
13              state constitutional standards.

14              (v) There was any other violation of federal or state
                constitutional standards.
15
Id.
16
17    Here, the trial court denied petitioner's motion to suppress the search warrant

18 after a hearing was conducted pursuant to Cal. Penal Code § 1538.5.  Reporter's Transcript

19 ("RT") at 15-107.  After an evidentiary hearing, the trial court held that petitioner's Fourth

20 Amendment rights were not violated when the Blazer was stopped, when the police officer asked

21 for identification of the passengers and when the officer found evidence that was used to convict

22 petitioner.  See id.  It is evident that petitioner was provided a full and fair opportunity to litigate

23 his Fourth Amendment claims.  Therefore, this claim is barred from federal habeas review under

24 Stone v. Powell, 428 U.S. at 481-82.

25    For the foregoing reasons, petitioner's claim that his Fourth Amendment rights

26 were violated is barred in this federal habeas proceeding.

/////

2.   <u>Ground Two</u>

Petitioner next argues that his Eighth Amendment rights were violated when the trial court considered two prior convictions when sentencing petitioner to twenty-five years to life.  Petitioner argues that the sentence imposed constitutes cruel and unusual punishment.

The last reasoned rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal:

II. [Petitioner]'s Strikes

[Petitioner] contends the trial court abused its discretion by denying his [People v. Superior Court (*Romero*) 13 Cal.4th 497)] motion to strike one of his strikes, and for that reason his sentence constitutes impermissible cruel punishment under the Eighth Amendment to the United States Constitution.  We disagree.

A. Facts Regarding the *Romero* Motion

[Petitioner] had two strike convictions for assault with a firearm (Pen. Code, § 245, subd. (a)(2)) committed at separate times.  [Petitioner]'s written *Romero* motion argued his last strike was seven years old and that he had not been in trouble since his release from prison.  He had been regularly employed, was married with five children, and was a dutiful parent, helping to coach one child's sports teams and attending school functions.  He provided a number of letters of support.  [Petitioner] argued the evidence of the current offense was weak and that his last strike arose from a plea he entered after several hung juries.  He also contended the present crimes were victimless crimes.

The People opposed the *Romero* motion.  In part the People contended the possession of three loaded pistols by three convicted felons—known gang members with long criminal records—was an aggravating circumstance.

The People also set forth a statement of [petitioner]'s criminal history, as did the probation report, and because [petitioner] did not interpose any objections, we presume those documents accurately reflect his criminal history.  (See *People v. Evans* (1983) 141 Cal.App.3d 1019, 1021.)

After juvenile matters involving stolen cars, as an adult, [petitioner] was convicted in 1992 of second-degree burglary, and after he violated probation, he was sent to prison.  Also in 1992 he was convicted of misdemeanor possession of a firearm by a felon.  In 1994, [petitioner] wounded a person by shooting from his car, and he was convicted of assault with a firearm and sent to prison.  In 1997, he was paroled, but within six months he committed a gang-related shooting from his car, leaving the victim a quadriplegic.  He was convicted of assault with a firearm, for the benefit of a street gang, and he was again sent to

12

prison.  In 2001, defendant was paroled, and after one return to custody, he was
/////
discharged from parole less than three months before the current offenses.
[Petitioner], Bush, and Ramos were validated members of a criminal street gang.

After hearing argument, including a personal plea by [petitioner], the trial
court concluded he was "in many ways the poster child why the three strikes law
should be applied."  The *Romero* motion was denied.

B. *Romero* Motion

In deciding a *Romero* motion, the trial court must "consider whether, in
light of the nature and circumstances of his present felonies and prior serious
and/or violent felony convictions, and the particulars of his background,
character, and prospects, the defendant may be deemed outside the scheme's
spirit, in whole or in part, and hence should be treated as though he had not
previously been convicted of one or more serious and/or violent felonies."
(*People v. Williams* (1998) 17 Cal.4th 148, 161; see *People v. Philpot* (2004) 122
Cal.App.4th 893, 905.)  We review the ruling under the abuse of discretion
standard:

> "In reviewing for abuse of discretion, we are guided by
> two fundamental precepts.  First, "'[t]he burden is on the party
> attacking the sentence to clearly show that the sentencing decision
> was irrational or arbitrary.  [Citation.]  In the absence of such a
> showing, the trial court is presumed to have acted to achieve
> legitimate sentencing objectives, and its discretionary
> determination to impose a particular sentence will not be set aside
> on review."'  [Citations.]  Second, a "'decision will not be
> reversed merely because reasonable people might disagree.  'An
> appellate tribunal is neither authorized nor warranted in
> substituting its judgment for the judgment of the trial judge.'"'
> [Citations.]  Taken together, these precepts establish that a trial
> court does not abuse its discretion unless its decision is so
> irrational or arbitrary that no reasonable person could agree with
> it."  (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377
> (*Carmony*); see *People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

Only in extraordinary circumstances will a career criminal fall outside the
scheme's spirit.  (*Carmony*, supra, 33 Cal.4th at p. 378; *People v. McGlothin*
(1998) 67 Cal.App.4th 468, 474.)

[Petitioner]'s motion in part argued his strikes were remote.  A prior may
be deemed remote when it is followed by a long crime-free period.  (*People v.
Philpot*, supra, 122 Cal.App.4th at p. 906 [trial court "could not overlook the fact
defendant consistently committed criminal offenses for the past 20 years"];
*People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 ["Where, as here, the
defendant has led a continuous life of crime after the prior, there has been no
„washing out' and there is simply nothing mitigating about a 20-year-old
prior"].)

/////

Viewed in this light, there was nothing "remote" about [petitioner]'s criminal history.  His strikes involved two shootings from cars in which his victims were injured, and he committed the instant crimes within three months of his discharge from parole.  He was found with two other gang members in a vehicle that had had three firearms in it before they were discarded, showing a lack of reform.  On these facts, the trial court properly rejected the claim of remoteness.

[Petitioner] argues the current offenses were not violent.  The purpose of Penal Code section 12021 is to protect public welfare by precluding the possession of guns by those who are more likely to use them for improper purposes, that is, convicted felons.  (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1037.)  Although [petitioner] did not use a gun in this case, as a matter of law such possession carried the potential for violence.  As stated, the strikes involved shootings from cars, and in this case he was with other gang members, armed with guns.  Thus, although the current offenses are not technically violent, we are not persuaded that their nature militated in favor of striking a strike.  Moreover, "the nonviolent or nonthreatening nature of the [current] felony cannot alone take the crime outside the spirit of the law."  (*People v. Strong* (2001) 87 Cal.App.4th 328, 344.)

[Petitioner] takes a portion of the trial court's comments out of context.  Defense counsel stated "So the evidence was very slim against my client.  Unfortunately, my client has the worst record and he faces the most severe punishment.  [¶]  THE COURT:  Yes."  On appeal [petitioner] states the trial court "noted the 'slim evidence' connecting appellant to the instant offense."  This is not a fair reading of the record.  The trial court may have been indicating he understood the argument, but more likely was saying "Yes" to the last sentence, agreeing that [petitioner] had the "worst record" of the three men.

Based on [petitioner]'s record, and the circumstances of this offense, the trial court did not abuse its discretion in concluding he fell within the spirit of the three strikes law.

## C.  Eighth Amendment Claim

We recently held that a noncapital sentence may violate the Eighth Amendment if "'an inference of gross disproportionality'" [citation] could be made by weighing the crime and the defendant's sentence 'in light of the harm caused or threatened to the victim or to society, and the culpability of the offender.'"  (*People v. Nichols* (2009) 176 Cal.App.4th 428, 435.)

[Petitioner] contends his 25-year-to-life sentence violates the Eighth Amendment because his current offenses are "relatively minor," and were "proven by the barest circumstantial evidence."  We disagree.

Taking the latter point first, counsel does not cite any authority supporting the proposition that the perceived strength or weakness of the evidence is a relevant factor for Eighth Amendment purposes.  For lack of authority, we reject the proposition.  (See *People v. Stanley* (1995) 10 Cal.4th

14

764, 793; *People v. Diaz* (1983) 140 Cal.App.3d 813, 824.)  We also reject counsel's assertion that the facts "suggest a strong possibility of a person in the wrong place at the wrong time."

As for the former point, as we have explained above, although the instant crimes did not involve the commission of violence, they were not technical law violations. [Petitioner], a convicted felon and known gang member, in the company of two other convicted felons who were also gang members, was in a vehicle with a ballistic vest, three pistols and ammunition (although the loaded guns were tossed out of the Blazer later).  This was a highly dangerous situation, particularly given that both of [petitioner]'s strikes involved shooting people from cars.

Nor is disproportionality shown by [petitioner]'s references to the sentences for many other crimes, because he fails to account for his strikes in making that argument.  For example, he notes that mayhem is punishable by 2, 4 or 8 years.  (Pen. Code, §§ 203, 204.)  But a person convicted of mayhem with two strikes would receive the sentence [petitioner] received.  That mode of argument does not show disproportionality.

[Petitioner] claims the trial court found the sentence "'wholly disproportionate' to the charges."  This again misreads the record.  The trial court noted that because [petitioner] had two strikes, he faced a sentence that otherwise would be disproportionate to the sentences of Bush and Ramos.  The trial court said "if you focus just on this particular offense, then it seems wholly disproportionate to give somebody 25 years to 22 life[.]"  In context, the trial court did not find the three strikes sentence to be disproportionate, given [petitioner]'s criminal record.

In *People v. Cooper* (1996) 43 Cal.App.4th 815, Cooper had two robbery strikes and his current offense was possession by a felon of a firearm.  Noting that the current crime was a serious offense and recidivism justifies "longer sentences for subsequent offenses," the court held Cooper's sentence did "not constitute cruel and unusual punishment under the Eighth Amendment." (*Cooper*, supra, 43 Cal.App.4th at pp. 824-825.)  [Petitioner]'s current offense, like Cooper's, is possession by a felon of a firearm, and [petitioner]'s strikes, assaults with firearms, are more severe than Cooper's robbery strikes. Accordingly, we reject his Eighth Amendment claim.

People v. Whisenant et al., slip op. at 15-22.

To the extent petitioner argues that the state court abused its discretion by giving credit to two prior convictions, the court finds that this is not cognizable on federal habeas review.  See Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see also Campbell v. Blodgett, 997 F.2d 512, 522 (9th Cir.1992) ("[a]s the Supreme Court has stated time and again, federal habeas corpus relief does not lie for errors of state law"); Miller v. Vasquez, 868 F.2d 1116, 1118-19

(9th Cir. 1989).  "[A] state court's interpretation of its [sentencing] statute does not raise a federal question."  Sturm v. California Adult Authority, 395 F.2d 446, 448 (9th Cir. 1967); Cacoperdo v. Demosthenes, 37 F.3d 504, 506 (9th Cir. 1994) (petitioner's claim that the state court erred in imposing consecutive sentences was not cognizable in federal habeas); Hendricks v. Zenon, 993 F.2d 664, 674 (9th Cir. 1993) (defendant's claim that state court was required to merge his convictions was not cognizable); Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir. 1989) (petitioner's claim that the trial court violated state law provision in sentencing him was not cognizable).

        The United States Supreme Court has stated that in addressing an Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law amenable to the [AEDPA] framework is the gross disproportionality principle, the precise contours of which are unclear and applicable only in the 'exceedingly rare' and 'extreme' case."  Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 290 (1983); and Rummel v. Estelle, 445 U.S. 263, 272 (1980)).  In Andrade, the Supreme Court concluded that two consecutive twenty-five years to life sentences with the possibility of parole, imposed in that case under California's Three Strikes Law following two felony convictions for petty theft with a prior, did not amount to cruel and unusual punishment.  538 U.S. at 77; see also Ewing v. California, 538 U.S. 11 (2003) (holding that a sentence of twenty-five years to life imposed for felony grand theft under California's Three Strikes law did not violate the Eighth Amendment).

        Following the decision in Andrade, the United States Court of Appeals for the Ninth Circuit has held that a sentence of twenty-five years to life in prison for a third shoplifting offense, a "wobbler" under state law[4], constituted cruel and unusual punishment.  Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004).  In so holding, the court in Ramirez relied upon the limited

---

        [4] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony under applicable state law.  See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

1  and non-violent nature of the petitioner's prior criminal history and the fact that the petitioner's

2  only prior period of incarceration had been a single one-year jail sentence.  Id. at 768-69.

3  Thereafter, in Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the Ninth Circuit distinguished the

4  holding in Ramirez from the situation it confronted, finding that the petitioner in Rios had a

5  "lengthy criminal history," had "been incarcerated several times," and that the prior strikes used

6  to enhance his sentence had "involved the threat of violence."  Id. at 1086.

7          This court finds that the sentence imposed upon petitioner in this case does not

8  fall within the type of "exceedingly rare" circumstance that would support a finding that his

9  sentence violates the Eighth Amendment.  In connection with the state court judgment, the

10  sentence of which he attacks in this habeas petition, petitioner was convicted of being an ex-

11  felon in possession of a firearm and ammunition.  In view of the decisions noted above, the court

12  cannot conclude that petitioner's sentence is grossly disproportionate to those crimes.  See

13  Harmelin, 501 U.S. at 1004-05 (life imprisonment without possibility of parole for possession of

14  24 ounces of cocaine raises no inference of gross disproportionality).  Moreover, as discussed by

15  the state appellate court, petitioner has an extensive criminal record.  People v. Whisenant et al.,

16  slip op. at 16-17.  Under these circumstances, the state court's rejection of petitioner's Eighth

17  Amendment claim was neither contrary to, nor an unreasonable application of clearly established

18  federal law.  Therefore, petitioner is not entitled to relief on his Eighth Amendment claim.

19          For all of the foregoing reasons, petitioner's application for a writ of habeas

20  corpus should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the

21  United States District Courts, "[t]he district court must issue or a deny a certificate of

22  appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. §

23  2254.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has

24  made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The

25  court must either issue a certificate of appealability indicating which issues satisfy the required

26  showing or must state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).

For the reasons set forth in these findings and recommendations, petitioner has not made a substantial showing of the denial of a constitutional right.  Accordingly, no certificate of appealability should issue.

Accordingly, IT IS HEREBY RECOMMENDED that

1.  Petitioner's application for a writ of habeas corpus be denied; and

2.  The district court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 28, 2011.

UNITED STATES MAGISTRATE JUDGE

/014;whis0697.157

18